**SO ORDERED.**

**SIGNED this 17 day of July, 2008.**



_____
A. Thomas Small
United States Bankruptcy Judge

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

| | |
|---|---|
| IN RE: | CASE NO. |
| DONALD WAYNE WOODBURN<br>SHARON YVONNE WOODBURN | 07-00927-5-ATS |
| DEBTORS | |

**ORDER REGARDING MOTION TO DISMISS FOR CAUSE**

The matter before the court is the bankruptcy administrator's motion to dismiss pursuant to 11 U.S.C. § 707(a) and (b). A hearing took place in Raleigh, North Carolina on July 9 and July 10, 2008.

Donald Wayne Woodburn and Sharon Yvonne Woodburn filed a joint petition for relief under chapter 7 of the Bankruptcy Code on April 30, 2007. On September 27, 2007, the bankruptcy administrator filed a motion to dismiss for cause pursuant to § 707(a), and in the alternative for abuse pursuant to § 707(b). The debtors contend that § 707(b) does not apply because their debts are not primarily consumer debts, and they maintain that cause does not exist under § 707(a) to dismiss the case.

Dr. Woodburn is an internal medicine physician who was employed with Louisburg Physicians at the time of the filing. His Schedule I shows $16,666 in monthly gross wages, plus

$2,500 in gross monthly income from his position as medical director of Britthaven Nursing Home. Schedule I also showed $8,259 in payroll deductions, including $1,406 for repayment of a rent advance by Franklin Regional Hospital and $667 for a 401(k) contribution. Mrs. Woodburn is not employed. Schedule J lists monthly expenses including $3,650 for rent, $96 for telephone, $97 for cable and internet, $1,200 for food, $977 for car payments, $600 for college expenses, $225 for car repair expenses, and $913 for income taxes for the Britthaven Nursing Home job. The Statement of Financial Affairs lists the following income from employment for Dr. Woodburn:

| Amount | Description |
|---|---|
| $10,000 | 2007 YTD: Britthaven of Louisburg |
| $66,664 | 2007: Louisburg Physicians |
| $148,573 | 2006: Louisburg Physicians |
| $30,000 | 2006: Britthaven of Louisburg |
| $0.00 | 2006: Business Income Franklinton Medical Practice PA - S Corp net income (Unknown) |
| $18,211 | 2005: Business income - medical services |
| $41,511 | 2005: Business income - Franklinton Medical Practice PA - S Corp net income |

Schedule B shows personal property valued at $38,656, with liens in the amount of $21,450 on the debtors' two vehicles. The Woodburns do not own any real estate.

The majority of the Woodburns' financial problems stem from unpaid income taxes. Schedule D shows a tax claim in favor of the IRS in the amount of $315,360 for taxes due in 1998, 2004, and 2005. Schedule E shows priority tax claims in favor of the IRS in the amounts of $11,935 for personal income taxes for 1999 and 2005, and $231,939 for business related income taxes for 1997, 1998, 2002 and 2004, as well as a priority claim in favor of the North Carolina Department of Revenue in the amount of $3,564 for business taxes in 2004 and 2005. Schedule F shows unsecured claims in favor of the IRS in the total amount of $347,010, though some of that amount

may be duplicative of the claim listed in Schedule D.[1]  Schedule F also reflects substantial debt related to Dr. Woodburn's former medical practice, Franklinton Medical Practice, PA, as well as debt for medical services provided to Mrs. Woodburn and student loans for the debtors' sons on which Mrs. Woodburn is a co-signer in the total amount of $68,974.

The testimony at the hearing provided some explanation of the genesis of the tax debt, and a far different picture of the Woodburns' income and expenses than the schedules reflect.  With respect to the tax debt, Dr. Woodburn explained that in 1997, when he had his own medical practice in Florida, the IRS advised him that he owed a substantial amount in taxes.  Dr. Woodburn did not recall what tax years those taxes were for or whether he had filed returns, only that the IRS agent was very aggressive.  Though Dr. Woodburn began making monthly installment payments, eventually he sold his medical practice in 1998 for $280,000, and the IRS took most of the proceeds.  The Woodburns "lost everything," and relocated to Louisiana.  Dr. Woodburn joined a practice with a friend in Louisiana, but that did not work out and the Woodburns moved to Louisburg, North Carolina, where Dr. Woodburn opened Franklinton Medical Practice.  Though he had learned from his experience in Florida that he needed to incorporate his practice, he apparently did not learn to keep better records or to file tax returns and pay income taxes.

Stuart Parker, the Woodburns' accountant, testified that the Woodburns retained him in 2001.  At that time, the debtors were delinquent with their individual returns for 1997, 1998, 1999 and 2000.  Mr. Stuart prepared those returns and filed them by May 2004.  All had taxes due.  Mr. Parker

---

[1] The IRS filed a proof of claim in the total amount of $297,965.92 (comprised of $216,952.90 general unsecured, $20,956 secured, and $60,057.02 priority unsecured).

planned to do the monthly accounting for Franklinton Medical Practice, but Dr. Woodburn did not provide him with the necessary documentation.

The Woodburns' 2004 and 2005 individual tax returns were signed by the Woodburns on April 6, 2007, after they filed their bankruptcy petition, and their 2006 return was dated by their accountant on July 9, 2007.[2] The income numbers listed in the statement of financial affairs for 2005 were derived from the personal tax return. However, the corporate tax returns had not been prepared or filed, and the pass-through numbers for Dr. Woodburn were simply estimates. In fact, the corporate returns for 2001-2006 were not prepared until 2008, and they showed substantially more income to Dr. Woodburn from his practice resulting in substantially more taxes due than originally reported. Specifically, for tax year 2004, the Woodburns' tax return showed income from the practice of $38,032, when in fact it was $192,301; for 2005 the individual tax return showed income of $41,511 when in fact it was $202,026, and for 2006 the individual tax return showed a loss of $35,000, when in fact Dr. Woodburn took $160,000 in income or draws. For 2001 through 2006, Dr. Woodburn owes an additional $234,161 in income taxes exclusive of interest and penalties above what is shown on the IRS proof of claim.[3]

In 2006, Dr. Woodburn stopped operating Franklinton Medical Practice and went to work as a W-2 employee of Louisburg Physicians. As mentioned above, Dr. Woodburn also acts as medical director for Britthaven Nursing Home, for which he is paid a gross amount of $2,500 per month. Since filing the bankruptcy petition, Dr. Woodburn has also worked as a hospitalist in a

---

[2] The court does not have any information on the debtors' individual tax returns for 2001-2003.

[3] Mr. Parker's summary of the estimated versus actual income, and the resulting tax liability, is contained on B.A. Ex. 13.

4

Carolinas Medical facility through a temporary staffing agency. His average income from that position is $5,008 per month, and his combined annual income from Louisburg Physicians, Britthaven, and Carolinas Medical totaled approximately $290,000. However, Louisburg Physicians was sold in April 2008, and Dr. Woodburn chose not to stay with the practice. As of June 30, 2008, he is no longer employed by Louisburg Physicians. He will have a permanent position as a hospitalist with Carolinas Medical in Albemarle, North Carolina beginning on August 1, 2008. His salary will be $193,300, and he will lose his position as medical director of Britthaven Nursing Home. In sum, Dr. Woodburn will have lost approximately $100,000 in income.

On the expense side, the Woodburns rent a house in Raleigh for $3,650 per month. The house was new when they moved in in 2002, and it has 6,078 heated square feet. It is a 5 bedroom house with 5.5 bathrooms, and the tax value of the property is $910,000. Dr. Woodburn explained that when they first moved to North Carolina, they rented a house in Louisburg. However, the owner of the house defaulted on the mortgage and the house was foreclosed. The Woodburns were given only a short time to find replacement housing, and because of the numerous tax liens showing on the debtors' credit report, apartment complexes and other lessors refused to rent to them. They finally found a builder who had been trying to sell a house for quite some time who was willing to rent the house to the Woodburns, and they have been in that house paying over $3,300 in rent ever since. Dr. Woodburn testified that he would be happy to move to a smaller, less expensive home, but he does not believe any lessor or bank will extend credit to him due to the tax liens. The Woodburns expect to have similar difficulties finding housing when he begins his job in Albemarle in August.

The Woodburns' other expenses look somewhat different than they appear on the schedules. First, the $1,406 that was listed as a payroll deduction on Schedule I was no longer deducted from Dr. Woodburn's check upon the filing of the petition. The deduction was a reimbursement for a leasing expense that had been advanced when Dr. Woodburn opened his practice as an incentive for opening the practice in Louisburg/Franklinton, and was repayment of an unsecured debt. The schedules showed $600 in payments going to the debtors' sons for school expenses, some of which are not currently being paid. The Woodburns are not currently making payments on the student loans for their sons' educations. Some of the average costs, such as food, account for times when the debtors' college-aged sons are at home, but then the schedules fail to offset monthly sums being provided to the sons to pay their expenses. Thus, the schedules show some significant expenditures that are not actually being made and are somewhat misleading with respect to other expenses.

On the other hand, some of the debtors' expenses are substantially understated. Schedule J shows $97 for cable and internet, but what appear to be quarterly payments to Time Warner Cable from July 2005 to March 2008 averaged $466, making a monthly average of $155. Dr. Woodburn testified that they have three or four cable boxes in their home. Schedule J also shows $96 per month for cell phones. Dr. Woodburn testified that at the time of filing, his practice paid for his cell phone and only one of his sons had a cell phone. However, telephone statements (including cell phones) dating back to 2005 showed a range of monthly phone costs from $193.19 to $1,403.60. The total for February 2007, the month prior to the petition date, was $1,182.83. Though providing the actual figures would reduce the amount of income available to pay creditors, the accurate figures do give the court a better picture of whether the expenses are "reasonable."

Finally, the Woodburns have three children, and all of them attend private schools. Their two sons attend private colleges, and their daughter just graduated from a private high school and will go to a private college in the fall. Both debtors testified regarding the importance of a quality education as well as the social needs of their children. Their oldest son and daughter both tried to go to public schools for a year, but both of them had difficulty adjusting and did not do well academically or socially. Their middle child has a learning disability and needs special attention that can only be provided in certain settings. All three have excelled at the schools they now attend.

The bankruptcy administrator contends that the case should be dismissed for cause pursuant to 11 U.S.C. § 707(a), or, alternatively, for abuse pursuant to § 707(b). Primarily, she maintains that the debtors have a substantial income, they maintain a lavish lifestyle, and they have made no effort to cut back on their budget. Under these circumstances, she contends, the attempt to discharge substantial debts is bad faith. The Woodburns contend that the majority of their debt, the tax debt, is not consumer debt. Accordingly, they did not complete the "means test" and they do not believe their case is subject to dismissal for abuse pursuant to § 707(b). They also maintain that § 707(a) requires more than a showing of ability to repay debts. Finally, the debtors note that even if they receive a chapter 7 discharge, they will still have $416,578 in nondischargeable debt. They maintain that they are not eligible for chapter 13, and that a chapter 11 case would require them to pay $4,800 per month just to address the tax debt, and they cannot afford a payment that high.

The court will consider this case under § 707(a), but notes that the result would be the same under § 707(b). Section 707(a) of the Bankruptcy Code provides that the court may dismiss a chapter 7 case "after notice and a hearing only for cause . . . ." 11 U.S.C. § 707(a). Cause for dismissal under § 707(a) has been held to include a lack of good faith in filing the petition. McDow

v. Smith (In re Smith), 295 B.R. 69 (E.D. Va. 2003); In re Zick, 931 F.2d 1124, 1126-27 (6th Cir. 1991). In ascertaining the debtor's lack of good faith the court should apply a totality of the facts and circumstances test. Perlin v. Hitachi Capital America Corp. (In re Perlin), 497 F.3d 364 (3rd Cir. 2007); Smith. Some of the factors include:

> 1. The debtor reduces creditors to a single creditor in the months prior to the filing of the petition;
> 2. The debtor failed to make lifestyle adjustments or continued living an expansive or lavish lifestyle;
> 3. Debtor filed the case in response to a Judgment pending litigation . . . ;
> 4. The debtor made no efforts to repay his debts;
> 5. The unfairness of the use of Chapter 7;
> 6. The debtor has sufficient resources to pay his debts;
> 7. The debtor is paying debts to insiders;
> 8. The schedules inflate expenses to disguise financial well-being;
> 9. The debtor transferred assets;
> 10. The debtor's overly utilizing the protections of the Code to the unconscionable detriment of creditors;
> 11. The debtor employed a deliberate and persistent plan of evading a single major creditor;
> 12. The debtor failed to make candid and full disclosure;
> 13. The debts are modest in relation to assets and income; and
> 14. There are multiple bankruptcies or other procedural "gymnastics."

In re O'Brien, 328 B.R. 669, 675 (Bankr. W.D.N.Y. 2005) (quoting In re Keobapha, 279 B.R. 49, 52 (Bankr. D. Conn. 2002)). The court may consider the debtor's ability to repay debts, but ability to repay debts alone is not sufficient grounds to dismiss a case under § 707(a).[4]  See Perlin; Smith.

In this case, it is clear that Dr. Woodburn is a good physician with a good salary and the capacity to make a very good living. Though that fact alone is not sufficient to dismiss the case, there are several other factors that concern the court. There are discrepancies in the statement of financial affairs and schedules. The statement of financial affairs substantially under-reports Dr.

---

[4] A totality of the circumstances test also applies with respect to dismissal for abuse under § 707(b), in which a debtor's ability to repay may be considered as a factor, but standing alone is not grounds for dismissal. Green v. Staples (In re Green), 934 F.2d 568 (4th Cir. 1991).

Woodburn's income for 2004 and 2005, and though Dr. Woodburn explained that the income figures were derived from his personal income tax return, the statement of financial affairs does not indicate that these figures are estimated or that the corporate tax returns had not been prepared. In addition, Dr. Woodburn should have known that his actual income was much higher than estimated, given that his rent payment alone was more than the reported income. The failure to accurately report his income, as well as a large portion of his expenses, is evidence of sloppy record keeping.

Dr. Woodburn's schedules also show a payroll deduction of $1,406 for an unsecured debt. While this deduction was technically an accurate depiction of the debtors' income on the day of the filing, the deduction stopped upon filing and the schedule should have been corrected to avoid misleading the court and creditors. Similarly, Schedule J shows a monthly expense for taxes for Dr. Woodburn's Britthaven job, which is misleading. Although he is responsible for these taxes, he is not paying estimated taxes and he is not setting aside funds to pay the taxes.

Though the debtors described themselves as leading anything but a lavish lifestyle, the fact is that they failed to reduce their expenses prior to or during their bankruptcy. They live in a 6,000 square foot house with monthly rent of $3,650. Though Dr. Woodburn explained why they moved into that house, he did not adequately explain whether they made efforts in the intervening 6 years to find more affordable and less spacious housing. Though the schedules reflected very reasonable telephone and cable expenses, the bills showed otherwise. Dr. Woodburn testified that they have 3 or 4 cable boxes in their home. The telephone expenses often exceed $500 per month.

The debtors' children are all enrolled in private schools, which many courts have held to be evidence of bad faith. The debtors did have good reasons to choose private schools for their children as opposed to accumulating assets, and, under the circumstances of this case, the choice to

9

send their children to private schools is not a determining factor in this court's decision to dismiss the case.

Most significantly, Dr. Woodburn failed to keep accurate business records and ignored his tax obligations even after losing substantially all of his assets to the IRS in 1998. He failed to file personal tax returns until he was preparing to file his bankruptcy petition, and even then did not prepare the necessary corporate returns until the eve of the hearing on the bankruptcy administrator's motion to dismiss. Because of his failure to keep records and file tax returns, he just learned that he has accumulated $234,161 in personal income tax debt since 2001 above and beyond what was reported to the IRS when the returns were originally filed and above that listed in the bankruptcy schedules.

Based on the foregoing, the totality of the circumstances show that this case was not filed in good faith. The debtors have a substantial income and could have and should have curtailed their expenses. And, with an appropriate adjustment in expenses, which may occur in any instance when they move to Albemarle, the debtors might be able to afford the payments required by a chapter 11 plan. The court will delay a final determination in this case for 30 days to allow the debtors an opportunity to convert the case to chapter 11. Otherwise, this case will be dismissed for cause pursuant to § 707(a).

**SO ORDERED**.

**END OF DOCUMENT**